Case number 16-1010. Judith Perry et al v. Randstad Gen Partners LLC. All arguments not to exceed 15 minutes per side. Mr. Jordan Lewis for the appellants. Good morning, your honors. My name is Jordan Lewis. I represent Judy Perry, Amy Dooling, and Erin Lane, the petitioner appellants. I wish to reserve three minutes for rebuttal. We are privileged and honored to be here this morning. The issue that we present to the court we think is simple and discreet and I hope and expect my argument today will be simple and straightforward as well. The issue is whether the defendant, in this case Randstad USA LLC, has fair labor standards act overtime requirements applies in this instance. We submit that the record below at the trial court level was mixed, does not demonstrate that this issue is resolvable as a matter of law and warrants a trial. I will briefly discuss the facts as they inform the rest of the company. What it does is it finds generally clerical and office staff workers to work at its clients offices in a temporary labor situation. The plaintiff appellants in this case all work for Randstad and made up four job titles, the four job titles that are at issue here today. Can you keep your voice up at the end of your sentences? Sure, I apologize. Thank you. The job titles are staffing consultant, senior staffing consultant, account manager, and senior account manager. And you're claiming that all of these do not qualify for the administrative exemptions? That's correct. So are there any jobs that would qualify in the company? Certainly. We have not pressed and I am not pressing today the job classification of assistant branch manager. These three plaintiffs worked out of the Troy, Michigan branch. Randstad organizes its operations nationally in multiple branch offices. So like many multinational branch establishments, the leaders of the branch office are typically exempt from the FLSA. The job titles at issue here, the job duties at issue here, are generally the same with one distinction that I don't think is material. In general, what they do is they connect Randstad's clients, its business clients, with prospects, temporary laborers. And there's no denying they are involved in companies' needs. The staffing consultant and the senior staffing consultant have an additional duty, and that is to attempt to locate other clients, other prospects for Randstad business clients. So do these four types of people produce prospects for the business clients and then the business clients pick among the prospects that are found, or do these four job categories actually pick the very person that's going to go to the business client? I think it's somewhere in between. The four job classifications that are at issue do not have the authority to hire, to fire, to discipline, to terminate. They can recommend, and that's it. That's as far as their authority is unleashed. So they don't have... They're not recommending to people senior in their company. They're recommending them to the clients, right? That's correct. So, I mean, the way I see the dichotomy is if you're screening for people senior to you, you're not going to be eligible. You're not going to have enough discretion. But if you're picking for clients, and it's very judgment-driven, as is, if they communicate well, is it a good fit? That seems to have a lot of discretion to it. Let's talk about the fit. The issue of finding the fit is what the district court fixed on, and it relied on three cases, and Randstad has found a few that fit this recruiter context. In a case like this, we've been criticized in the briefing papers as losing the forest through the trees. It's my belief that this case is all about the trees. It's all about the minute details. And if you compare the job responsibilities, the powers that the clients have, and compare it against the cases cited by Randstad, cited by the district court, you'll find some overlap. But where there isn't overlap, those other cases had more, those other cases involved greater authority. For example, the ability to fire, to hire, to discipline. I just don't, I guess I don't know what that means here. It's a placement service, right? That's the key thing. And you can have all kinds of guidance in the company about how you do it, what we're looking for, so forth and so on. But it just seems like the only dichotomy that makes sense to me is one that says, okay, one possibility is your screening. Your job is to screen for other people within your company to decide which ones to send to the clients. And the other option is, no, you apply these criteria and you pick them. And it's true, the client may not agree to use them. The client may send them back. All that may be a second option and doesn't have a lot of judgment in it. And that seems to be this case because they're not screening for other people within the company. That's what I don't understand. They are, two things. They are restricted by Randstad through application of very conscriptive screening requirements. In other words, they're not at liberty to choose from A to Z. Randstad gives them very discreet screening criteria. And it goes beyond the guidelines to the point where Randstad gives these employees a one or two page form applicable to the job at issue. In other words, the employees, the appellants here, are to attempt to match Randstad's criteria with the pool of applicants to place with Randstad's client. It doesn't say, here are the five things we want. And if you find someone that meets all five, always send them out. It doesn't say. That's just not how it works. It has the judgment of, is this a good person for this job? It's not just checking boxes. And that's where the judgment comes in. I mean, it's a human enterprise. What I would submit, Your Honor, is that to some extent there's judgment involved in every step of every facet of probably every job. But nevertheless, the question is whether it rises to the level contemplated by the administrative exemption. And we're talking about this completely without reference to, basically as the trial court did, to what's called the WPI, or the Work Productivity Index. It seems to have different names. I noticed that yesterday. That one, I don't see how that has any bearing on the case. That's just making sure they work hard. No, it's not. That's not restricting their discretion as to the people they're recommending to the client. Your Honor, I would submit that it, let me explain to you how it works. Because I don't think we did a... You can use your time on that. But it doesn't seem like your strongest point. It seems to me about making sure the number of hours and the time they're putting into the job. Do they send one person for each opening? Not necessarily, no. But they'll send one person, and if the client doesn't like that person, they'll send another. They're not sending four people and saying, these are four good people that we've pre-screened, and then they leave it to the client. I don't know that there's a universal rule here. My sense is that, in general, they attempt to fill the positions opened at the clients. Should it make a difference whether what they're asked to do is to say, do the people in our job pool meet some basic requirements, like education, and then forward all who meet the requirements to the client? Or are they being asked, pick the best one or two, in which case they're using some kind of factors, and then we could get into, are they using factors that are scripted for them? But does that basic differentiation become an important one? I don't think so. In all cases, they are subject to and applying Randstad's FIT criteria. So whether they're promoting... But how detailed are the FIT criteria? If the FIT criteria are, for an accounting position, does the person have a BS in accounting? If so, they meet the criteria. Then there's no discretion being exerted. It's really just checking the boxes. This is the kind of analysis that the trial court did not engage in. The trial court, again, to use Randstad's view, looked at the forest and didn't bother with the trees. And as I said, I think that this is the kind of fact-specific case of the type that you're looking at that is not amenable for summary judgment and warrants a trial. Are there disputes about what their job duties are? No, I don't think so. What would a trial accomplish? It would explore the... There are no fact disputes. But the trial court made no factual determination of the type that this court is inquiring about. I appreciate Your Honor's view on the WPI. I want to take one shot at it. The 100 points that employees are required to score in a given week, the way it works is they are organized by job activity, say 20 points in this week for off-site visits and 8 points this week for telephone calls. The only discretion involved in the performance of that activity by these employees is in what order are they going to perform these activities in a given week. There's no ambiguity. They have to score 100 points in a week. I agree with you. It's a productivity measure and it doesn't give them discretion. I agree with that entirely. But I don't understand how that helps you with the point that they're exercising discretion when it comes to the people that are recommending the clients. Because every time Randstead, and it's every week that Randstead, establishes this 100 point requirement and assigns different activities that my clients have to satisfy in order to be required by virtue of the application of this 100 point test to not perform other functions. By imposing certain requirements, job activity requirements, Randstead has made the determination that other activities don't count and don't get to the 100 points. These employees have no ability to add on to their weekly obligation. Suppose the WPI said you have 100 points, 20 points have to be looking for jobs in the academic industry and 20 points have to be looking for jobs for our clients in the computer industry and 20 points, etc. Would that then show that they don't have any discretion at all if within finding academics they're making all sorts of evaluations? No, I don't think so. But the WPI is much more specific than that. It's much more specific as to required activities. It's not a general description. It is a very specific... Things like you must be making telephone calls seeking new clients or something. Right. And you should understand, Your Honor, that the points are not a function of time. For example, an out-of-office visit may be a two- or three-point assessment or score even if it takes half a day. It necessarily takes the discretion away from these people in the performance of their job activities. Yes. Would that be one of them, an out-of-office visit? Yes. And it would be that general? No, I don't believe it is that general. Give us an example. The sales function of these job descriptions is typically done in the office. Ranstead does not want people to go out of the office because Ranstead has scripts that it wants to enforce the use of. So a job requirement, a point total on the WPI would be phone calls to X number of prospects, business prospects. And there are points associated with that. We've taken you well over your time. Thank you very much. May it please the Court. Good morning. My name is Jennifer Riley. I represent Defendant Appellee Ranstead General Partner U.S. This Court should affirm summary judgment in favor of Ranstead because the District Court correctly found that the FLSA's administrative exemption applies to the plaintiffs. Are there any entry-level employees that are not administrative? There are, Judge. What do they do that's different from what these people do? One of the plaintiffs in this case actually, oh, I apologize. One of the plaintiffs in this case actually that's not at issue in this appeal was named Suhaima Chowdhury, and she actually exercised the function of what we call a talent acquisition specialist, which means she was responsible for merely sourcing candidates. So it's that kind of function. Sourcing candidates, checking off criteria, that kind of function the company does not designate or classify as exempt. Those are actually non-exempt positions. Does the record show what percent of the people in this office were classified as exempt versus non-exempt under this administrative exemption? I don't believe it does, Your Honor. It was a small branch office, so I know there was at least one non-exempt, and then the three plaintiffs were exempt. But I don't recall if there are a few others who also worked there. I mean, it sounds like, I mean, it sounds like there are a lot of people who worked there. If this is a small office and these are the people working there, the four of them, it sounds like, with the exception of the first one, they're all exempt. I mean, that most of the work that's done there to produce the product for the client is exempt the way you look at it. I mean, a lot of what Dooling did doesn't seem to be terribly discretionary. I realize that the plaintiffs haven't separated out the various plaintiffs, but... Your Honor, Dooling, Ms. Dooling actually testified to the same sort of matching activities and matching functions that the other plaintiffs do as well. She testified that it was important for her to understand her client's business, to know the client's environment, the way the office is run, the hierarchy of the office, what interaction each position is having with different departments within the client. But why does that show that she's exercising discretion as opposed to that she just needs to know what the client's need is? She's exercising discretion to find out what the client's need is so that she can fill it. She can make that match between the client's needs and what a candidate can bring to the table. She actually testified that it was about knowing your client so that you could be a true business partner, so that you could find the true fit, so that your client would keep coming back to you. So she explained that to make that match, she used skills listed on an individual's resume. She used additional skills, past work experiences, other things that she came to know through conducting her own interviews with these candidates and through reference checks. And then she presented these candidates to the client. Did she present just the best candidate to the client, or did she present the array of candidates that would meet the criteria of the client? She presented the best candidates to the client. Candidates with an S. I'm sorry, excuse me, Your Honor. Candidates with an S, in other words, plural candidates, or... Your Honor, both was happening here. So sometimes the client would want to interview, and so the staffing professional would narrow it to two candidates, for instance. Sometimes the client would not conduct that interview. Ms. Lane, for instance, testified about 20% of the time, at least. She was making the selection and sending a candidate to the client who had never met the manager and who had never been on site. Would it make a difference if there was a supervisor within Randstad who was evaluating the work of the people who are the plaintiffs here before the work was then sent to the client? Your Honor, that's actually the situation that was presented. In a case we cited, Andrade versus Aerotech, and the court found, nevertheless, that the staffing professional was exercising the discretion to find the fit, even though the selection was going through a higher-level manager. And in that case, that higher-level manager was sending about 75% of her recommendations onto the client. And the court, nevertheless, found that that was a sufficient exercise of discretion and independent judgment. And what court was that? That was the District of Maryland. It's a 2010 opinion. My recollection, and correct me if I'm wrong, is that most of the cases here seem to be district court-level? Your Honor, that is correct. So we have a Department of Labor opinion letter that sets out the department's view of staffing professionals like the plaintiffs. And then we have that guidance being applied in several district courts. If I may talk about the opinion letter for just a moment. The Department of Labor found that staffing managers who exercised selectivity in matching person-seeking employment with the requirements of job openings, and in deciding which candidates to send to particular employers, exercised the requisite discretion and independent judgment to fall within the administrative exemption. That is similar to what plaintiffs are doing here. The plaintiffs here were sourcing candidates. They were matching them to the client's needs. They were investigating what the client wanted. They were going out. They were identifying candidates. They were screening them. They were interviewing them. They were looking for the criteria and the fit, if you will. And then they were selecting... These contests, these sales contests, that according to the plaintiffs were just added on to their regular requirements. Should we be looking at that separately? I mean, first of all, are those sales calls just looking at that function? Is that administrative? Yes, Your Honor. There was a lot of discretion and independent judgment that also came into play with respect to the client development and sales function that a few of the plaintiffs were exercising as well. I'm talking about that contest. So contests about making contacts or... I felt that there was a contest that would take place periodically, maybe once a quarter, where everybody was required to make a certain number of calls on top of their regular duties. And that was just an added requirement. And those were basically cold calls. I'm not sure I recall the exact circumstance you're thinking of, but certainly the testimony was that if I decide, if I'm making cold calls, I'm identifying the people. I'm selecting them based on Internet searches, based on my Rolodex, based on contacts I've made. So the individual plaintiffs were selecting who to make those calls to. So if somebody's job is to sit at a phone all day and cold call and collect the prospects that sound, you know, oh, this person's looking for a job, this person has a high school education and sounds interesting over the phone and this, and then I give a list to somebody, that is an administrative job? Well, Your Honor, respectfully, that's not what the plaintiffs were doing here. So at one point, yes, they have to make cold calls, but the point of the cold calls is to identify and to develop a pool of candidates that they can then match with their clients. So let's suppose half the time was cold calls and half the time is then matching. Would you say then that person qualifies under the administrative exemption? I would say yes, but again, I don't think that's the, that's not the record here. The record here is that their primary duty involved the matching. And so there are a lot of steps involved with matching the, excuse me, with matching the position with the correct individual and making that best fit match. You were relying on a, on a ruling, I believe, and is the ruling you're relying on the 2005 WHD letter? Yes, Your Honor. So my understanding is that the employees that were covered by that letter had full that they supervised. Is that present here? Yes, it is, Your Honor. Actually, I meant to correct that in the record as well, because the plaintiffs represented that the staffing professionals here did not have the authority to do that. And in fact, the record shows otherwise. So the staffing professionals are firing the people that they're recommending to the clients? Is that the way it works? Yes. Ms. Lane testified that it was her, she did have that discretion. So it was part of her job to manage the people she placed. If somebody called in sick, they called her. She had to tell the client, hey, that person's not coming in today. She might have to send a replacement. She was checking in with the client to see how her people were performing. If there were issues, it was her job to counsel and make sure that everything was running smoothly. So she, sorry that I missed this concept, but so the people that are being placed in the client are just temporary people. Is that right? There are. Normally a client wants to control the people who are working for them, I would think. Yes. And I think the client is controlling the performance of the job duties. However, the client, in terms of who's showing up that day, do I have somebody who's a good fit who can perform that job? There's still very much a connection with the placement agency. If there's something going wrong with that temporary worker, that worker's not performing, he's not showing up, he's not dressed according to standards, anything that's wrong with that relationship, the client is reaching back out to the placement agency to correct it. And the placement professional had the discretion to counsel and also determinate. You rely on the testimony of these three plaintiffs for this purpose? Correct. Ms. Lane testified that sometimes the client did make that decision. Sometimes the client told her that the client did not want this person. But then sometimes it was up to her. And sometimes she was making the recommendation to the client about whether to give the person another chance, about whether to pull the person and supply a replacement. I want to just go back to what I was asking you before. Let's say you have a group of people who have an administrative obligation and once a month everybody in the office has to work until 3 in the morning doing inventory or some sort of clerical task that's done at the first of every month and people have to do this in addition to their regular jobs. How does the law treat that? Where it's clearly not a discretionary task, it's a somewhat regular part of their employment and it leads to a significant amount of overtime. Does that get carved out and the people are entitled to be paid for that? Or what do they do? Your Honor, the law doesn't require that every single task these individuals perform involve discretion. No, I understand that. But I'm giving you a hypothetical where there is a discrete task that's placed on top of the regular job so that you can see these are two very clearly different functions and the latter function is something that requires overtime by definition and people are required to do it. Does that just get ignored? The inquiry here under the law is what's the primary duty. So if the primary duty is the exercise of discretion and independent judgment, it's okay if some steps that are incidental to that discretion involve, let's say, clerical or administrative tasks. Again, though, that's not the record here. The record here is that these individuals were taking the steps to make the match. I understand that. I'm really driving at something else I'm trying to figure out. Let's say it was once a week they had to do this. It's not their major task. I mean, that's part of the hypothetical. It's not. But once every week they're required to pull an all-nighter. Do you ever, is there ever a situation where you would bifurcate part of the function or are you saying that once you're administrative, as long as the employer doesn't impose tasks that reach to the point where it's a major part of their work or a significant part of their work, the employer can require whatever they want and it's up to the employee to say no? Well, Your Honor, that's an interesting hypothetical. It's almost reminiscent of like a dual jobs inquiry. Are you performing an exempt job over here versus an hourly job over there and at what point do you cross that line? Is there an answer to that? I don't know that there is an answer to that, Judge. Here, certainly the record is not that. And the test we're applying here is what's the primary duty and does the primary duty involve the exercise of independent discretion and judgment? How is primary duty defined? I think that would help to answer Judge White's question. If primary duty is defined as the majority or the preponderance or the substantial majority, is there some regulatory definition or is it dependent on case law? I don't know that there is a regulatory definition of primary duty. The scenario we have here is that the primary duty involved matching, finding the best fit, and we're talking about a lot of prerequisite steps and a lot of exercise of discretion and independent judgment to make that match and to make that pairing to develop business and make the client happy. A lot of follow-up steps to maintain that relationship, to build those relationships. Your opponent argued that there was a fact question that should be resolved in a trial that summary judgment is premature. How do you respond to that? Your Honor, summary judgment was not premature here because the District Court relied on the admissions of the plaintiffs themselves. As the plaintiff admitted in the District Court, how an employee spends his time is a question of fact, but whether those activities fall within an exemption is a question of law. Here, there's no dispute about how the employee spent his time or her time because she admitted to it in her deposition testimony. The question about whether those admissions fall within an exemption is a question of law, which the District Court correctly addressed on summary judgment. Any further questions? What do these people make? Your Honor, the record reflects that they make at least the statutory minimum. I don't recall how much above that that they make. Statutory minimum meaning the minimum wage? Oh, no. Apologies. There's a statutory minimum for the application of the administrative exemption, which I believe is around $455 a week. The $455 a week is the minimum for the application of the administrative exemption. And they exceeded that. And do you concede that this job takes a lot more than 40 hours a week? The plaintiffs testified that they spent more than 40 hours a week. I do concede that they couldn't have performed this job in 40 hours a week. There's really nothing about the WPI that the plaintiffs talk about that required any particular amount of time. The WPI lists tasks like making calls, making placements. Certainly, there's no prescription in there about how an employee needs to go about doing those things. It was an activity Does the record show how many hours these three people worked? It does not, Your Honor. And do you agree that there was this periodic extra duty on top of the 100 points of basically cold calling that everybody had to do on top of their job? No, Your Honor. I believe the record reflects only very infrequent contests that were optional for employees to participate in, to help generate sales for the branch, being the ultimate goal. I believe so. I believe they were contests so that someone could choose to go for the prize or not. But there are contests within the branch? Yes, I believe so. We only know about three employees in the branch? Correct. We only have here the testimony of the three plaintiffs and a fourth former plaintiff. Right. Any further questions? Thank you very much. Thank you. Thank you, Your Honors. Briefly, the Aaron Lane testimony that I believe counsel referenced, Aaron Lane had the job of assistant branch manager. I don't have the testimony in front of me, but I suspect that she was testifying as to her duties as an assistant branch manager, which we concede is properly exempt. She also held multiple positions of the four that are at issue here. We presented record citations to the court in our briefs where the appellants have testified. They had no right to hire or to fire, and I suspect that the Lane testimony relates to her job as assistant branch manager. What are the fact disputes that need to be resolved here? I can't figure out. I know there's disagreement about how to interpret the exemption, screening, all that, how to interpret the orders below, but what are the fact disputes that would need resolution? I think that we've touched on them today. For example, the contest, which my reading of the record shows they were required. They were more than branch wide. What's the competing evidence? Whose witness says A and another witness says opposite of A? There's no competing evidence, but there is no consideration or application of the evidence. But isn't that a legal question? Yeah, that's not. In other words, once we know that so-and-so said there were these contests, and that's the only evidence that there is in the record, then we can say, well, the fact of these contests means that they are exempt or they aren't exempt. Hypothetically, if that was such an important thing. Maybe you're entitled to judgment as a matter of law. Yeah, because your opponent said there's no fact question. So if she's right on the law, she wins. If she's wrong on the law, you win. In my review of the cases, and again, this goes to the prism from which you view this case, whether you view it at 30,000 feet or in the weeds, and I think the proper place is in the weeds. There are nothing but district court cases that have reviewed recruiting cases, recruiting misclassification issues. My view is that the Ogden case, which is a District of Arizona case cited in our briefs and not cited either by Rancid or the district court, provides the correct prism. That's legal. No, but in Ogden, what the court found is that the job definitions did not line up with things like the 2005 Department of Labor letter and required, I think it was a court trial, as to the implications of the fact. In Ogden, they denied summary judgment on the defendant's motion for summary judgment and found that at least the application of the facts to the law in that instance required a trial. I've never heard of a case where there's agreed upon facts, and yet it doesn't become a legal question at that point. That's the way it usually works. And I think the fact that the lawyers aren't sure they remember the record, exactly what happened doesn't answer it. We can go see what the record says. If the record supports one side, it supports one side. There's no doubt about that. I think that the correct result here is a thorough hashing of the facts at trial. I certainly have no quarrel, and I understand the court's position that the facts are not in dispute. The court should also know. You didn't move for summary judgment below. No, no. What happened was we moved in conformity with the trial's calendar for conditional certification. The defendant responded by opposing that and by filing a motion for summary judgment. There was something like there was about a year left in the discovery calendar at that time. And what they did, they had already taken the depositions of the four defendants, and they have laced their briefs below in here with snippets of depositions. For plaintiffs, right? Right. Okay. Right. And that basically comprises the record. We took a 30B6 deposition and a general counsel deposition, but that was it. And one of the things we pointed out to the district court is that the record, there was a year left in order to come up with, to mature the record. And Rancid concluded that wasn't necessary. Thank you very much. Thank you, Your Honor. Thank you both for the argument. The case will be submitted with the clerk call the next case.